IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| AMCO INSURANCE COMPANY, ) | | |
| ) | | |
| Plaintiff, ) | 2:08-cv-01355-GEB-JFM | |
| ) | | |
| v. ) | ORDER | |
| ) | | |
| BROANE-NUTONE,LLC; JAKEL, INC. ) doing business in California as ) JAKEL INDUSTRIES, INC., ) | | |
| ) | | |
| Defendants. ) | | |

On July 22, 2009 Defendants filed a motion for summary judgment on all Plaintiff's claims in this insurance subrogation action. The parties dispute whether a ceiling exhaust fan installed in the laundry room of Perpetuan and Crispen Soliven's residence caused a fire in that residence, and whether either or both Defendants defectively designed and/or manufactured the component of that fan alleged to have caused the fire.

The motion was heard on September 14, 2009. Subsequent to the hearing, Defendant Broane-Nutone, LLC ("Broan-Nutone, LLC") filed a notice of bankruptcy under Chapter 11 of the Bankruptcy Code, staying this case against it. However, the remaining parties, Plaintiff and Defendant Jakel, Inc. ("Defendant" or "Jakel"), have not argued that this stay applies to them. Cohen v. Stratosphere Corp., 115 F.3d 695, 697 (9th Cir. 1997) (stating a Chapter 11 bankruptcy stay does not ordinarily preclude nonbankrupt parties from proceeding in the case.)

## I. BACKGROUND

Plaintiff alleges negligence and strict liability claims against Defendant Jackel for a design and manufacturing defect in a ceiling exhaust fan installed in the laundry room of the Solivens' residence. Plaintiff contends the alleged defects caused a fire in that residence on September 23, 2006. The fan was installed beside a light fixture, which had a separate on-off switch. (Plaintiff's Statement of Undisputed Facts ("PSUF") ¶¶ 7, 42). The Solivens purchased their home as new construction in 1990 and were the only two people residing there at the time of the fire. (Id. ¶¶ 11, 13.) "The Soliven residence includes two and one-half bathrooms and a laundry room, each containing an exhaust fan." (Id. ¶ 12.)

Plaintiff contends Jackel manufactured the defective component of the exhaust fan that caused the fire. "At the time of manufacture, the subject fan was comprised of the following components[:] (1) the electric motor sub-assembly, which includes the thermal cut-out protector and motor windings; (2) the power receiver, which connects the fan to the building power source (the fan plugs into the power receiver in the same manner as an appliance plugs into a wall electrical outlet); (3) the motor plate that attaches to the fan housing; and (4) the fan grille." (Id. ¶ 39.)

Jackel argues Plaintiff cannot prove the fan was used, contained a design or manufacturing defect, and caused the fire. (Def's Mot. 9:18-15:7.) Jackel also argues Plaintiff failed to preserve key evidence, and because of this failure Plaintiff's complaint should be dismissed. However, this dismissal argument "was [not] presented to . . . the Magistrate Judge during the discovery phase of this case" as required by Local Rule 302(c)(1) and the

1  Scheduling Order filed on September 10, 2008. <u>Toomer v. U.S.</u>, 2008 WL
2  4369312, at *4, n. 1 (S.D.Cal. 2008). Therefore, it is waived. <u>See</u>
3  <u>Freeman v. Allstate Life Ins. Co.</u>, 253 F.3d 533, 537 (9th Cir. 2001)
4  (upholding district judge's declination to sanction because of party's
5  "fail[ure] to prosecute the issue before the magistrate judge as
6  required by . . . Local Rule . . . and the court's . . . order");
7  <u>E*Trade Securities LLC v. Deutsche Bank AG</u>, 230 F.R.D. 582 586
8  (D.Minn. 2005)(revealing that allegations of discovery misconduct,
9  including the spoliation of evidence, concern discovery issues).

## II.   STANDARD

"Summary judgment is appropriate if the pleadings together with the affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. A material fact is one that might allow judgment in favor of the party opposing summary judgment." <u>Pacific Northwest Venison Producers v. Smitch</u>, 20 F.3d 1008, 1013 (9th Cir. 1994)(internal citation and quotations omitted). Further, "all reasonable inferences supported by the evidence [are drawn] in favor of the non-moving party . . . " <u>Guidroz-Brault v. Missouri Pacific R. Co.</u>, 254 F.3d 825, 828 (9th Cir. 2001).

## III.   ANALYSIS

### A.  Use and Causation

Defendant argues since undisputed evidence shows the Solivens never turned on or "used" the fan, Plaintiff cannot prove the "use" or "causation" elements of its claims. (Def's Not. of Mot. 2:3-7; Def's Mot. 9:14-15:7.) Defendant presents deposition testimony from each Soliven supporting its position that the laundry room fan

3

was never turned on.  Perpetuan Soliven's deposition testimony on this point follows:

> Q. Have you ever used the laundry room fan?
> A. No.
> Q. During the entire time that you resided at the home since 1990, you never used it?
> A. No.

(Def's Mot 11:6-13, Ex. E, Perpetuan Soliven Dep. 29:1-9). Crispen Soliven's deposition testimony is as follows:

> A. [W]e don't use that fan.
> Q. Is that correct?
> A. Yes.
> Q. Have you ever turned it on?
> A. No.

(Def's Mot 11:6-13, Ex. F, Crispen Soliven Dep. 18:1-5).

Defendant also relies on the declaration of Eliot Duncan of Broan-NuTone, LLC who declares, "based on his personal knowledge and expertise" of having "worked in the general area of design, engineering and development of small motorized household products for 40 years:"

> The subject fan was designed to expel air from the home through ducting, thus it was a source of air for the fire.  This air flow in the area of the fan contributed significantly to the damage in the area of the fan.  This damage has led plaintiff to the improper conclusion that the fan started the fire.
>
> [. . .]
>
> The subject fan was turned 'on' or 'off' by a wall switch.  When the switch for the fan was in the 'off' position for 16 years, as was testified to by the Solivens, the fan was not energized, i.e. the fan did not have any electricity flowing through any component of the fan, including the motor. Thus, it was impossible for any component of the fan to have allegedly failed when said components were not operational during the entire 16 years that the Solivens resided at the subject residence.

(Def's Mot. 12:19-21, Duncan Decl. ¶¶ 1, 3, 6, 12.)

Plaintiff counters with the following averments from its expert Jeff Goode ("Goode"), an electrical engineer "with specialization in forensic investigation of electrical failure." (Goode Decl. ¶1).

> 4. I have personal knowledge of the condition of the Subject House because **I personally inspected the Subject House several days after the fire.**
>
> 5. **Examination of the electrical branch wiring of the Subject House, and applying the method of arc tracking, I determined that a fire had originated in the ceiling of the laundry room.**
>
> 6. **Three ignition sources were identified in the ceiling space of the laundry room. First, the electrical branch wiring, which was immediately eliminated due to the nature and location of the electrical activity. Second, was ceiling light. Third, was a ceiling ventilation fan ("The Subject Fan."). I inspected both.**
>
> 7. The **subject light fixture was eliminated** for the following:
>     a. No electrical failures were found within the fixtures or surrounding wires, thus leaving overheating as a potential cause.
>
>     b. Overheating was eliminated due to fact that first the fixture remains showed no abnormal heating, was designed for insulated ceilings, which includes a thermal protective device, and installed in the laundry room ceiling with no insulation.
>
> 8. **Based on the shape, parts, and metal structure I was able to determine the Subject Fan was most probably the same in style and model to another ceiling fan ("Exemplar Fan") in the Subject House.** The Exemplar Fan suffered minimal damage and was well preserved. The exemplar fan is labled "Mercury" by NuTone which utilized a Jackel Industries electric motor.
>
> 9. **In addition to being able to match the Subject Fan to the Exemplar Fan, I have been involved in several other matters between (past and present) that involve a similar type of fan and motor manufactured by Nutone, and therefore, was also able to identify this subject fan independent of the exemplar fan.**
>
> [ . . . ]

5

> 11. ***The Subject Fan was manufactured by NuTone and is suspected of utilizing a Jackel Industries electric motor. Also, the fan motor windings are suspected to be made of aluminum as copper windings most probably would have survived the fire.***
>
> 12. Considering the ignition sources, the burn patterns of the remaining ceiling joist materials; ***the fan was the most probable cause of the fire.***
>
> [ . . . ]
>
> 20. It is my opinion that ***the Subject Fan most probably caused this fire due its aluminum motor winding and its known difficulties in connection to the copper lead out wire.*** The evidence to date supports that the failure starts with an over heating due to a high resistance at the copper/aluminum connection, starting a series of events leading to the fire. Furthermore, one of the signatures of the past fan fires is the melting of the fan cover from the inside. The evidence examined had this signature.

(Goode Decl. ¶¶ 4-9, 11-12, 20)(emphasis added).

Defendant objects to Goode's declaration arguing it lacks foundation, is vague and ambiguous, and fails to counter the testimony that the fan was never used. (Def's Obj. to Goode Decl. ¶¶ 9, 15.) However, Goode declares he "consider[ed] the ignition sources [and] the burn patterns of the remaining ceiling joist materials [and determined] the fan was the most probable cause of the fire." (Goode Decl. ¶ 12.) These averments controvert Jackel's evidence and create a genuine material dispute on the issue whether the laundry room fan was used.

Defendant also argues Goode's declaration should be stricken because he is not qualified to testify as an expert because he is not "a fire investigator trained in determining the cause and origin of fire," and does not have any experience "in the design and manufacture of electric motors for small appliances, such as exhaust

6

fans." (Def's Obj. to Goode Decl. ¶¶ 1, 18.) "Generally, an expert need not be officially credentialed in the specific matter under dispute." Thompson v. Whirlpool Corporation, No. C06-1804-JCC, 2008 WL 2063549, at *4 (W.D. Wash. May 13, 2008) citing Thomas v. Newton Int'l Enters., Inc., 42 F.3d 1266, 1269 (9th Cir. 1994). Goode has an electrical engineering degree from California State University at Sacramento and has engaged in "forensic investigation of electrical fires [and] electrical failures" from April 1996 to November 2008. (Pl's Opp'n, Goode's Decl., Ex. A.) Defendant has not shown Goode's "lack of particularized expertise goes to [anything other than] the weight accorded [his] testimony . . . " United States v. Garcia, 7 F.3d 885, 890(9th Cir 1993).

Defendant also objects to Goode's method of "arc tracking," arguing it is "vague and ambiguous" and that Goode's conclusion that the "fire had originated in the ceiling of the laundry room" is improper. (Def's Obj. to Goode Decl. ¶ 2.) However, Goode discusses three ignition sources: "First, the electrical branch wiring, which was immediately eliminated due the nature and location of electrical activity. Second the ceiling light. Third was the ceiling ventilation fan." (Goode Decl. ¶ 6). In light of Goode's averments the objections are overruled.

Defendant also argues Goode's elimination of the ignition point of "branch wiring" "'due to the nature and location of the electrical activity'" is "vague and ambiguous." (Def's Obj. to Goode Decl. ¶¶ 3-4.) Defendant argues Goode's elimination of the light fixture due to "'abnormal heating'" is also "vague and ambiguous" because "abnormal heating" is not explained. Id. However, an affidavit that "d[oes] not describe in detail how [the expert] arrived

7

at his conclusions, [but] g[ives] more than a bare conclusion that the defendant[] [was at fault] and that [its fault] caused the accident . . . . [is] admissible to support [P]laintiff['s] opposition to the motion for summary judgment." Bieghler, 633 F.2d at 533.

Defendant also objects to Goode's averments that the fan is "suspected of utilizing a Jackel Industries electric motor" and that the "fan motor windings are suspected to be made of aluminum," contending these statements are speculative and lack foundation. (Def's Obj. to Goode Decl. ¶ 8.) Goode declares he inspected the subject fan and "based on shape, parts, and metal structure [he] was able to determine the Subject Fan was most probably the same in style and model to another ceiling fan ("Exemplar Fan") in the Subject House, [which] . . . was well preserved [and] . . . is labled 'Mercury' by NuTone [and] which utilized a Jackel Industries electric motor." (Goode Decl. ¶ 8.) Therefore, these objections are overruled.

Defendant also objects to other portions of Goode's averments and Plaintiff's other evidence presented in opposition to the motion, but these objections need not be decided because the evidence admitted in opposition to the motion creates a genuine issue of material fact on the issue whether the subject fan was used and caused the fire.

**B.  Design and Manufacturing Defects**

Defendant also argues Plaintiff has not identified a manufacturing or design defect in its claims, and consequently, cannot prove its negligence or strict liability claims based on these theories of liability. (Def's Notice of Mot. 2:3-7; Def's Mot. 9:14-15:7.)  Plaintiff counters with the following Goode testimony:

22.  ***The Subject Fan was manufactured with an electric motor, which utilized an aluminum motor winding wire.*** That motor winding wire was coiled around a plastic bobbin and was connected to a copper lead out wire. I believe the fan utilized an aluminum wire as opposed to a copper wire because aluminum has a substantially lower melting point than copper; therefore in a fire it is common for the aluminum motor winding wires to completely melt away, whereas a copper wire will survive a fire unless the fire is exceptionally hot. In this instance, ***I believe the subject fire was not hot enough to melt the copper because copper electrical wiring leading to the fan was still intact.*** In this instance, ***the aluminum motor winding wire was completely absent, which evidences that the motor of Subject Fan was manufactured with an aluminum motor winding. In my experience every fire involving a Nutone Fan was found to use aluminum motor windings***.

23.  ***The use of an aluminum motor winding in the electrical motor constituted a defective design for the following reasons:***

   A.  It was known that connections to aluminum wire are problematic due to:

      1. Aluminum wire corrodes when exposed to atmosphere so that the connection area must be cleaned and treated with a oxidation inhibiting compound, "NO-OX," immediately before connection. Otherwise the oxidation causes a high resistance (HOT) connection.

      2. Aluminum expands and contracts due to heat at a higher rate than copper or Aluminum/copper alloys causing initially tight connections to become loose over time.

   [ . . . ]

   D.  ***Because of aluminum's unforgiving nature as to improper connection, (as set forth in Paragraph 23A), the use of aluminum, as opposed to copper, for the motor winding increased the likelihood of a fire caused by a manufacturing defect if there was an imperfect in the crimp connection.***

   E.  ***The Subject Fan most probably utilized a crimp connection between the aluminum winding and copper lead out wire***

> 24. For the foregoing reasons and based on my examination of the subject fan and several others like it in past and current cases, the **Subject Fan suffered design defects as set forth herein. Use of copper motor windings were a known and inexpensive fix[] to the design defect.**
>
> 25. **Based on my through knowledge of the design defect of the model of the Subject Fan, it is my opinion that the Subject Fan likely suffered from a manufacturing defect which was compounded by the design defect**.
>
> 26. **The subject fan most probably utilized a crimp connection between the aluminum motor winding and the copper lead out wire.** As previously stated, the use of aluminum to a copper connection creates the propensity for a fire unless the connection, in this case, a crimp, is properly executed to prevent a loose connection.
>
> 27. **Because a crimp connection between an aluminum solid wire and a larger diameter copper stranded wire must be executed with exact precision, the likelihood is the connection was imperfect leading to a high resistance and resulting in a fire.**
>
> 28. Based on my experience, education, training, and familiarity with the subject fan model and NuTone fans substantially similar, it is my opinion that when the **fan was manufactuered the crimp connection between the aluminum motor winding wire and copper lead wire was not properly executed to manufacturing specifications and manifested itself years later.**

(Goode Decl. ¶¶ 22, 23A, 23D, 23E, 24-28) (emphasis added).

Defendant objects to Goode's averments arguing Goode's opinions on design and manufacturing defects are speculative, lack foundation, and are vague and ambiguous. (Def's Reply 3:7-4:22, 9:5-27, Def's Obj. to Goode Decl. ¶¶ 17, 18, 22-26.)  Defendant argues since the integral fan components do not exist, Goode was never able to examine the components and therefore his opinion that the fan had "aluminum motor winding" and a faulty "crimp connection" has no factual basis and is inadmissible.  (Def's Reply 3:7-12, 4:3-22, 9:23-27.)

However, Goode declares he examined the "copper electrical wiring leading to the fan," and since the "copper electrical wiring leading to the fan was still intact," and the "aluminum motor winding wire was completely absent," this "evidences that the motor of [the fan] was manufactured with an aluminum motor winding" "because aluminum has a substantially lower melting point than copper." (Goode Decl. ¶ 22.)  Since sufficient foundation exists for Goode's opinion, the objections are overruled.

Defendant argues Plaintiff's evidence on the design and manufacturing defects is insufficient, citing the Ninth Circuit decision in Triton Energy Corporation v. Square D Company, 68 F.3d 1216 (9th Cir. 1995), as support for its argument that Goode's expert testimony lacks sufficient substance to defeat Defendant's summary judgment motion.  In Triton, an entire circuit breaker alleged to have caused a fire was discarded and the Plaintiff's expert, who gave an opinion that the circuit breaker caused the fire, had never examined the circuit breaker. The Ninth Circuit stated:

> A jury should not be asked to evaluate the credibility of experts concerning the defectiveness of a [product] and its container when it left the hands of [Defendant], which the experts have neither seen nor can see, and which was manufactured more than two decades ago.  These circumstances would impose upon the jury the unenviable task of listening to two experts' opinion unsupported by any physical evidence to bolster either opinion. [Plaintiff, who bears the burden,] has failed to establish the existence of an element essential to its case on which it will bear the burden of proof at trial.

68 F.3d at 1222.

Triton, however, is distinguishable, because "neither [party in Triton could] point to any physical evidence that support[ed] their claim[,]" and the plaintiff's expert "never examined

the allegedly defect circuit breaker." Id. at 1221-22.  Here, Plaintiff has shown that Goode examined evidence remaining after the fire and examined an exemplar fan in the same residence that had suffered minimal fire damage and was well preserved.  Plaintiff has provided sufficient evidence supporting its design and manufacturing defect claims to controvert Defendant's motion.

**IV.   CONCLUSION**

Therefore, Defendant's motion for summary judgment is **DENIED.**

Dated:   December 27, 2009

_____
GARLAND E. BURRELL, JR.
United States District Judge